IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CITY OF LINCOLN, Nebraska, A municipal corporation, | ) ) ) | |
| | ) | 4:10CV3030 |
| Plaintiff, | ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| WINDSTREAM NEBRASKA, Inc., | ) ) | |
| Defendant. | ) | |

Defendant Windstream Nebraska, Inc. ("Windstream") has moved to reconsider the court's ruling, (filing no. 105), which granted the City of Lincoln ("City") leave to disclose an additional expert out-of-time. Windstream's motion to reconsider states Windstream was not afforded an opportunity to create a record in opposition to the City's motion.[1] To assure

---

[1] The evidence in support of the motion to reconsider further states:

> The Memorandum and Order entered herein on July 21 appears to place significant emphasis on the fact that Mr. Hedrick's name had not been identified in a Rule 26 report prior to the testimony he gave on July 18 as the corporate designee of Windstream. . . .[T]here was never any plan or intent by me or Windstream to withhold or fail to disclose Mr. Hedrick's factual knowledge regarding Windstream's telecommunications technology.

Filing No. 108-1, ¶ 22. The affidavit does not cite to the portion of the memorandum and order stating or implying Windstream violated Rule 26, and I had no intention to send such a message. The court can only assume the following portions were misconstrued.

It is undisputed that the City is requesting leave for late disclosure of an additional expert. Quoting Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008), the court explained that "[w]hen a party fails to provide information or identify a witness in compliance with Rule 26(a) or (e), the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." Rule 26(a) includes expert disclosures, which the City failed to timely make. The court was not stating Windstream's disclosures were insufficient.

The memorandum and order also explains, by footnote to both parties, that the court expects the parties to comply with the current Rule 26 expert disclosure deadlines, specifically as they pertain to not only retained, but non-retained experts. (Filing No. 105, p. 1). As explained to the

due process and a thorough and complete record for the anticipated appeal of this decision, the undersigned magistrate judge has afforded the City and Windstream an opportunity to present evidence in support of their respective positions; conducted a hearing on the record to further elicit the parties' arguments and obtain answers to the court's questions and concerns; and reconsidered the prior ruling *de novo*.

Neither party objects to the evidence filed of record by the opposing party. Therefore, for the purpose of this motion only, such evidence is received., and all the evidence and arguments offered by the parties (see filing nos. 108, 109, 111, and 112) have been considered. For the reasons set forth below, the motion to reconsider is denied, and the City's motion to disclose an additional expert out-of-time is, and remains, granted.

STANDARD OF REVIEW

Pursuant to Rule 16(b)(4), a case management order setting progression deadlines "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements. . . . , [but the] 'existence or degree of prejudice to the party opposing the modification' and other factors may also affect the decision." Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir. 2001). In general, the court will not consider prejudice, or the lack thereof, if the movant has not been diligent in meeting the scheduling order's deadlines. Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 716-17 (8th Cir. 2008).

---

parties during the hearing on July 29, 2011, the footnote was included to clarify the court's expectation, thereby hoping to avoid any future controversy over how and to what degree the current Rule 26 applies to cases filed before it was amended. The footnote does not, and was not intended to, cast blame on either the City or Windstream regarding past Rule 26 disclosures.

During the course of the parties' arguments, Windstream strenuously claimed the court could not consider prejudice absent an initial finding of "good cause." As applied to the Rule 16 good cause analysis, the terms "good cause" and "due diligence" are neither interchangeable nor synonymous. Rather, the movant's level of diligence and the degree of prejudice to the parties are both factors to consider when assessing if good cause warrants extending a case management deadline, with the movant's diligence being the first consideration and the extent of prejudice to either party considered only following a requisite threshold finding of due diligence. Sherman, 532 F.3d at 716-17; Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 759 (8th Cir. 2006). In all cases involving the interpretation and application of the Federal Rules of Civil Procedure, the court must fairly and with equal consideration to both parties balance the obligations and positions of the parties to promote the "just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1; Marmo, 457 F.3d at 759.

FACTUAL RECORD

The City's lawsuit was filed against Windstream in the District Court of Lancaster County, Nebraska on January 13, 2010, and was removed to this forum on February 12, 2010. (Filing No. 1). The City alleges Windstream violated Lincoln Municipal Code § 3.24.080 et seq. (see filing nos. 32-1 (2009 ordinance), p.2 & 32-2 (2001 ordinance), p. 2), by failing to pay telecommunication occupation tax ("TOT") for certain telecommunication service components offered and provided to customers within the City. (Filing No. 42, (Amended Complaint)). The "final" progression order entered on April 20, 2010 was amended three times thereafter upon the parties' joint or unopposed motions, (see filing nos. 26, 49, 78). Under the current progression order entered on March 10, 2011, plaintiff's expert disclosure deadline was March 31, 2011; the pretrial conference was set for August

23, 2011; and subject to any criminal trial setting,[2] trial was set to commence the week of September 12, 2011. (Filing No. 78).

The following categories of telecommunications services are subject to TOT under the language of Lincoln Municipal Code § 3.24.080:

> "Basic local exchange services;" defined as "the access and transmission of two-way switched communications within the city, including local telephone and telecommunications services."
>
> "Inter-exchange services;" defined as "the access and transmission of communications between two or more local exchange areas, provided that such interexchange service either (a) originates from an end user with the city or (b) terminates with an end user within the city, and is charged to a service address within the city regardless of where the charges are actually paid."
>
> "Mobile services;" defined to include "any radio or similar communication services provided pursuant to license or authority granted by the Federal Communications Commission, charged to a service address within the city regardless of where the charges are actually paid, including cellular, radio paging, and mobile radio services."
>
> "Any other similar (emphasis added) telecommunications services involving any electronic or electromagnetic transmission of messages originating or terminating in the State of Nebraska and charged to a service address in the City of Lincoln, regardless of where the charges are actually paid."

Lincoln Municipal Code § 3.24.080 et seq. See filing nos. 32-1 (2009 ordinance), p.2 & 32-2 (2001 ordinance), p. 2.

---

[2]During the hearing on July 29, 2011, the parties were advised that four criminal cases had been set to begin on September 12, 2011 before Judge Kopf. The parties were also advised of the six-week criminal trial scheduled to begin on October 3, 2011, and how that trial has and will continue to impact Judge Kopf's September 2011 trial calendar.

There are now five criminal cases set before Judge Kopf for the week of September 12, 2011.

For the purposes of the pending motion, the issue is whether the City should be allowed to designate an expert who can explain the use of "private lines" by Windstream customers and whether such uses are provided through, or included within, the categories of taxable telecommunication services identified in the ordinance.

On March 31, 2011, the City disclosed Garth Ashpaugh, a certified public accountant, as an expert witness. (Filing No. 108-1 (Tricker Affidavit), ¶ 3). Mr. Ashpaugh has worked on utility matters and regulation full-time for over twenty years, including providing consulting services since 1991 and working as Audit Supervisor with the Missouri Public Service Commission. He has not, however, designed or constructed telecommunication systems and does not claim to be an expert regarding the engineering and technical components of any such system, including Windstream's system in Lincoln.

Prior to initiating this lawsuit, the City had hired Mr. Ashpaugh and his firm to review and analyze whether Windstream was paying taxes to the City as required under Lincoln Municipal Code § 3.24.080. (Filing No. 109, at CM/ECF p. 2). Mr. Ashpaugh identified as least 13 areas of tax underpayment by Windstream, including failure to pay TOT on "private line" revenues. (Filing No. 109, at CM/ECF pp. 3-4).

Mr. Ashpaugh used Windstream's website description of its "private line" features when concluding such services were subject to TOT. As described on the website, Windsteam markets, sells, and provides:

Private Line Features
- A dedicated, secure, private transmission path.
- Always-on connectivity with fast, reliable transmission.
- No usage fees. Pricing based on distance between locations.

- Connect your enterprise network point to point.
- Carries voice, data and video for your multi-site business.
- Delivered over Windstream's redundant and secure transport network.
- 24/7 customer support.

Filing No. 109, at CM/ECF p. 7. Relying on this description, Mr. Ashpaugh concluded a Windstream private line is a telecommunication service subject to TOT under Lincoln Municipal Code § 3.24.080. (Filing No. 109, at CM/ECF p. 7).

On April 29, 2011, Windstream timely disclosed Daniel J. Caldwell and Jeffrey L. Pursley as experts. (Filing No. 108-1 (Tricker Affidavit), ¶ 5). Mr. Caldwell is a CPA and results-oriented financial management executive, (filing no. 109, at CM/ECF pp. 32-33); Mr. Pursley has a bachelor's degree in computer science, accounting, and business, followed by "extensive experience in the areas of universal service, financial modeling, cost recovery, and rate design," (filing no. 109, at CM/ECF p. 52). Neither Mr. Caldwell nor Mr. Pursley have training or experience in the design, engineering, or construction of a telecommunication system, including the Windstream system in Lincoln, Nebraska.

Mr. Caldwell's report addresses the alleged deficiencies in Mr. Ashbaugh's report, specifically focusing on whether Mr. Ashpaugh correctly applied the City's ordinance in the context of telecommunication industry standards, laws, and regulations. Specifically, Mr. Ashpaugh applied four criteria in responding to Mr. Ashpaugh's opinions, including the following:

1. Does the service fall within the relevant Ordinance or common industry definitions of "telecommunications service"?

    The first criteria attempts to determine if the service specifically falls within the Lincoln City Ordinance. If additional guidance

-6-

>>is required, the analysis compares the service to common industry definitions of telecommunications service.

>2. Do the charges for the specified service represent gross receipts "resulting from" the provisioning of the services specified in the Ordinance.

>>The second criteria will assess the source of the gross receipt and whether it is related to the services specified in the Ordinance.

Filing No. 109, at CM/ECF p. 22. Mr. Caldwell's report makes no specific mention of how these criteria apply to "private line features" offered and sold by Windstream.

Mr. Pursley's report specifically discusses whether Windstream's "private line" features are subject to taxation under Lincoln Municipal Code § 3.24.080. Mr. Pursley explains the City's authority to collect TOT is limited to the categories described in the ordinance, and the category descriptions within the City's ordinance differ from those routinely used in the industry or referenced in the Federal Telecommunications Act or the Nebraska Revised Statutes. Mr. Pursley asserts industry and statutory standards and definitions should be used when interpreting the City's telecommunication taxation ordinance, and cites to the reporting rules and regulations of the FCC's Federal Universal Service Fund and the remittance rules and regulations of the Nebraska Public Service Commission ("NPSC") Nebraska Universal Service Fund ("NUSF") as instructive when interpreting the ordinance. (Filing No. 109, at CM/ECF pp. 38-40). Applying these industry standards and statutory definitions to the language of Lincoln Municipal Code § 3.24.080, Mr. Pursley concludes a "private line" is not a taxable "Basic Local Exchange Service," "Inter-Exchange Service," or telecommunication service "similar" to a "Basic Local

Exchange Service" or an "Inter-Exchange Service because it does not connect to the telecommunication provider's switched network. (Filing No. 109, at CM/ECF pp. 45-46).[3]

After receiving Windstream's expert disclosures, the City did not request or otherwise indicate a need to retain, identify or disclose any additional or rebuttal expert witnesses. (Filing No. 108-1 (Tricker affidavit), ¶ 7). Instead, on May 26, 2011, the City sent an email to defense counsel along with a proposed Rule 30(b)(6) notice of deposition. (Filing No. 109, at CM/ECF p. 60). The Rule 30(b)(6) notice sought Windstream deposition testimony regarding:

> 1. The construction, engineering design, function, capabilities, technical components and system operation of the Windstream Nebraska, Inc.'s telecommunication system within the City of Lincoln, specifically as it concerns private line services, switched services (whether part of the local exchange or other exchanges), toll services or any other similar telecommunication service.
>
> 2. The billing practices of Windstream Nebraska, Inc., related to private line service, switched service, (whether part of the local exchange or other exchanges), toll services or any other similar telecommunication service in Nebraska.
>
> 3. The Windstream Nebraska, Inc records involving customer usage of facilities and lines sold as private line service.

Filing No. 109, at CM/ECF p. 64.

On June 9, 2011, Windstream identified Brad Hedrick as its 30(b)(6) designee. (Filing No. 109, at CM/ECF p. 70). Mr. Hedrick, defendant's Vice President of Operations,

---

[3]The undersigned magistrate judge acknowledges this summary of Mr. Pursley's opinions is over-simplified. The description is for the purposes of this motion only. It is not intended to be construed as an in-depth review of the substance, admissibility, or the weight to be afforded to Mr. Pursley's opinions.

has a bachelor's degree in electrical engineering and an M.B.A. from the University of Nebraska. He has been employed by Windstream Nebraska, Inc. or its predecessor companies in the telecommunications industry for approximately 32 years, focusing primarily on the engineering and technical aspects of telecommunications, including internet protocol, fiberoptic transmission systems, and digital and broadband services. (Filing No. 112-1, ¶ 12).

Windstream deposed the City's retained expert, Mr. Ashpaugh, on June 13, 2011. During his deposition, Mr. Ashpaugh explained he believes private lines are subject to TOT because they are "switched communications." (Filing No. 109, at CM/ECF p. 76). The City deposed Windstream witnesses Vicki Anger[4] and Mickey Marshall[5] on June 16 and June 17, 2011, respectively. Both witnesses testified they had no specific knowledge about how Windstream's telephone system in Lincoln, Nebraska works. (Filing No. 109, at CM/ECF pp. 84-90).

---

[4] Ms. Anger is a designated Windstream 30(b)(6) witness with "general information about Windstream's collection and payment of occupation tax to the City of Lincoln and engaged in discussions with the auditor retained by the City of Lincoln to review the occupations tax issue." Filing No. 109, p. 95.

[5] Mr. Marshall is a designated Windstream 30(b)(6) and former Windstream employee with "general information about Windstream's collection and payment of occupation tax as well as the 2002-2006 audit that was conducted by the City." Filing No. 109, p. 96.

Due to deposition scheduling issues, followed by a necessary change of plaintiff's trial counsel,[6] the deposition of Windstream's 30(b)(6) witness, Brad Hedrick, was not conducted until July 18, 2011. (Filing No. 109, at CM/ECF p. 91).

Since 2004, Mr. Hedrick has been responsible for managing the overall Nebraska network for Windstream (and its predecessor companies), as well as managing the customer service and business system technicians who provide and install Windstream services for customers. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at pp. 8-9). Mr. Hedrick testified the term "telecommunications," as used in the industry, the FCC, Nebraska statutes and presumably the Lincoln Municipal Code § 3.24.080, applies to only voice services (e.g. telephone), and not data (e.g. computer networking) or information (e.g., internet) services. Telecommunication services are switched[7]; data and information services are not. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at pp. 9-10).

Mr. Hedrick testified that after a customer's equipment is installed and activated by Windstream, the end user (Windstream customer) decides whether the equipment will be used for telecommunications subject to TOT under Lincoln Municipal Code § 3.24.080, or

---

[6] The City designated Steve Huggenberger, one of its trial counsel, as its 30(b)(6) representative to testify regarding the City's opinion on the scope of telecommunication services subject to TOT and the basis for any changes in that opinion during various time periods; communications between the City and Windstream on the issues of this case; and the City's process for deciding to conduct an audit. (Filing No. 109, at CM/ECF p. 98). Rodney Confer therefore replaced Mr. Huggenberger as one of the City's trial counsel, and to afford Mr. Confer some ability to prepare, Mr. Hedrick's deposition was delayed to July 18, 2011. (Filing No. 109, at CM/ECF pp. 82-83).

[7] A "switch" is a large computer-based processor equipped with network elements which include: 1) line terminations generally to copper pairs that go out to customer telephones; and 2) digital trunk interfaces that allow interconnection to other switches, including those of long-distance carriers for telephone calls. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at p. 12).

for data or information services, which are not subject to TOT under the ordinance. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at p. 12). At least to some degree, Windstream is able to anticipate how the customer will use the equipment it sells and/or installs. For example, if a customer receives a switched telephone line, Windstream assumes the predominant use of the equipment is a telecommunication (voice) service even though the same equipment can be used for data transmission. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at p. 12).

Private lines can also be used for both voice and data communications. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at p. 96). See also, filing no. 112-5, (Hedrick 30(b)(6) deposition), at p. 100 (a private line circuit connection may be used for data, information, or video service)). However, Windstream does not pay TOT on private lines because, from its perspective, private lines are data communication services, not telecommunication services. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at p. 93). Mr. Hedrick testified that Windstream markets and provides "private line" services, defined as a transport data connection of T1 circuits over copper or fiber which extend from Point A to Point B. Private lines do not use a router or Windstream's voice switch network or data network. However, except in unusual circumstances, private lines do go through a central office located between points A and B. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at pp. 65, 70-71).

With private line customers, the Point A to Point B circuit is provided by Windstream, but terminates at a network interface unit with Windstream. Windstream is responsible for the network side of the interface, but the customer decides how the private line is used. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at pp. 66-67). "[T]he customer determines what they plug into [the private line], how they use the service." (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at 67). See also, filing no. 112-5, (Hedrick 30(b)(6) deposition), at p. 76 (explaining the Windstream sales staff may advise customers concerning the "type of

private line service that would be compatible with their needs," but private line customers "don't necessarily tell us what it's going to be used for. In fact, I don't know that they ever tell us what it's going to be used for."). Voice communication or data transmission can go from a customer's private line on to the Windstream network, (filing no. 112-5, (Hedrick 30(b)(6) deposition), at pp. 74, 92), but a customer may also have a PBX for switching calls within their own entity over their private line. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at p. 77, 92). Windstream has no way to know when a private line customer is using a PBX on the customer side of the network interface to perform call switching. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at p. 102).

## LEGAL ANALYSIS

The underlying question presented by the City's motion is whether the City should have anticipated it would need a retained expert, and would not be able to rely on a Windstream representative to explain how Windstream private line customers use their private lines. The City claims the lack of knowledge expressed by Windstream's 30(b)(6) witness came as a surprise, it should therefore be permitted late disclosure of an expert. Windstream claims the City has the burden of proof and as such, cannot assume Windstream witnesses will provide the information necessary to prove an element of the City's case.

The question of when a party should anticipate needing a retained expert is substantially dependent on the facts of the case, the theories of recovery being advanced, and common sense. For example, except in circumstances within the lay understanding of jurors (e.g., operating on the wrong patient), a plaintiff suing for medical malpractice should anticipate the need for a retained expert, and should not assume the defendant will provide the expert opinion testimony necessary to prove his or her own culpability. However, in the context of proving how products are used by consumers, the Eighth Circuit has long held

that "[t]he realities of the intended and actual use are well known to the manufacturer and to the public and these realities should be squarely faced by the manufacturer and the courts." Polk v. Ford Motor Co., 529 F.2d 259, 264 (8th Cir. 1976) ; Larsen v. General Motors Corp., 391 F.2d 495, 503 (8th Cir. 1968).

Parties and courts need not resort to expert testimony when determining whether the use of a product or service renders it taxable or exempt from taxation. In Comcation, Inc. v. U.S., 78 Fed.Cl. 61, 62 (Fed. Cl. 2007), the plaintiff, an Internet service provider (ISP), brought suit against the United States to obtain a refund of FCC excise taxes paid in connection with its purchase of service lines from telecommunications carriers to provide dialup internet access for its customers. The plaintiff claimed it need not pay the tax because the lines it purchased were configured only for incoming services, and therefore the lines did not provide two-way communication subject to FCC excise taxes. Experts had been disclosed regarding the financial aspects of the case and the meaning of the FCC taxing regulations, but the testimony of the plaintiff's owner was relied on to explain the communication lines configuration purchased, the way it was used within the company, and the product it sold to customers. Comcation, Inc., 78 Fed.Cl. at 65 (denying plaintiff's claim for a refund, in part because the application of the FCC excise tax on "local telephone service" is based on the capabilities of the services purchased, without regard to whether the customer chooses to actually use the purchased capabilities).[8] See also, Hostar Marine Transport Systems, Inc. v. U.S., 592 F.3d 202, 213 (1st Cir. 2010) (holding the owner's statement concerning its described use of hydraulic boat trailers did not support the off-highway transportation exception because the court must evaluate the designed, not the actual use. "The test for taxability under [§ 4051(a)(1)] is primary design, not primary use....

---

[8]To be clear, this opinion should not be construed as making or suggesting any ruling or determination regarding whether the City must show actual use or designed use as a telecommunications service for the purposes of Lincoln Municipal Code § 3.24.080. That issue is reserved to Judge Kopf, the assigned district judge.

Indeed a use test would be unworkable since there would be no way of knowing how a given article would be used by the consumer at the time of sale."); Worldwide Equipment, Inc. v. U.S., 605 F.3d 319 (6th Cir. 2010)(same ruling and analysis applied to deny off-road excise tax exception for heavy-hauling trucks); Dillon Ranch Supply v. U.S., 652 F.2d 873, 881 (9th Cir. 1981)(relying on manufacturer's advertising and marketing of product in determining trailers were capable of use on public roads, and therefore subject to excise tax, despite manufacturer's claim that they were primarily sold and used as off-road "farm wagons"); Freightliner of Grand Rapids, Inc. v. U.S., 351 F. Supp. 2d 718, 728 (W.D. Mich. 2004)(considering testimony of the plaintiff's new truck sales person and a medium duty sales manager in determining incomplete chassis cabs sold by the dealer were "tractors" for the purposes of federal excise tax).

Under the facts presented, it is not clear the customer use information requested from Mr. Hedrick was expert opinion testimony, as opposed to facts typically known by a manufacturer or supplier of goods and services. The need for an expert did not arise until after Mr. Hedrick testified he had no idea, and no way to find out, how Windstream customers actually use the private lines they purchase and/or have installed through Windstream. Before that deposition was taken, the City was aware of Windstream marketing explaining that its private line features carry "voice, data and video for your multi-site business," "[d]elivered over Windstream's redundant and secure transport network," with "24/7 customer support." (Filing No. 109, at CM/ECF p. 7). It is difficult to envision how Windstream can claim to provide customer service with no information on how individual customers are using its product. Windstream's 30(b)(6) deponent, Mr. Hedrick, manages the customer service and business system technicians who provide and install Windstream services for customers. (Filing No. 112-5, (Hedrick 30(b)(6) deposition), at pp. 8-9). If he does not know how Windstream customers use its private line product, it is unlikely anyone within that company does.

The court finds the City exercised due diligence and was justifiably surprised to find out that no one employed by Windstream can testify concerning the use of private lines by Windstream's customers, and that a retained expert would be necessary to discuss the issue. It is further clear that to the extent the City must prove customer use as an element of its case, it will be prejudiced if not permitted to retain an expert. As explained in the court's prior order, (filing no. 105), any prejudice to Windstream can be ameliorated by extending the *Daubert* deadline and expediting the briefing schedule on those motions.

Good cause exists for modifying the court's progression schedule and permitting the City to disclose an additional witness out-of-time under the schedule set forth in the court's prior order, (filing no. 105).

Accordingly,

IT IS ORDERED:

1) Windstream's motion to reconsider, (filing no. 107), is denied.

2) Paragraphs 1 through 4 of the court's prior order, (filing no. 105), remain in effect.

DATED this 1st day of August, 2011.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

\*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.